The last case for argument this morning, United States v. Glasgow and Duval. Good morning, Your Honors. My name is Mark Werner and I represent the Appellant Robert Glasgow. Your Honor, this is an appeal and a challenge to the District Court's denial of Rule 35 relief to Mr. Glasgow. I'd like to make certain facts very clear to the Court. At Mr. Glasgow's sentencing, the District Court told him that it was reluctant to accept the plea agreement, but that it was going to do so in Mr. Glasgow's case because of his testimony against the co-defendant at trial and his cooperation. The Court thereby gave Mr. Glasgow what the plea agreement called for, which was a maximum of 36 months. Immediately thereafter, at the Rule 35 hearing, which the government moved for in light of Mr. Glasgow's cooperation, the District Court stated clearly that it felt that its acceptance of the plea agreement and the resulting, in its eyes, obviously lenient sentence was sufficient consideration for Mr. Glasgow's cooperation. The Court therefore refused to consider Mr. Glasgow's cooperation further and denied the Rule 35 relief. That is the summary of facts of what happened. And then the other point that we have to deal with, it seems to me, is that there was no – because I understand there was no objection on the Section 5K1.1, failure of the government to make a motion under that section. So the District Court didn't have a chance to tell us what he thought about that. That's true, Your Honor. That's true. So now my question is, let's say that we determine that under our case law, as we look at it now, and we do distinguish between that motion and a Rule 35 motion, and there's been no objection at the time, so we now look at it under plain error. Would you go to that point and tell us why you think it meets the plain error standard? And I just might say particularly because we seem to have a reluctant judge here, and even giving as lenient as he thought it was lenient, I'm not making a judgment one way or the other. So that's kind of the issue I'm wrestling with on the case. Well, the prejudice to Mr. Glasgow I think is – might be hard to find, Eva, because it was clear even though the government should have filed a 5K1 motion, because that is what would have been appropriate given the timing of everything that occurred. It is clear that the judge at sentencing was considering his assistance prior to sentencing. So even though it was filed as a Rule 35B motion, I guess it was clear to all the parties that the assistance that was being considered was assistance prior to sentencing. So in a practical effect, I have to admit I don't know what difference it would have made. Because we just don't know. Because we don't know. I mean, it's possible that – it is always, I think, instructive to the court when the government actually makes a motion as opposed to the court just looking at the group of facts. I mean, it may well have changed the outcome. Is there any difference in the standard in judging a 5K and a 35? Your Honor, with regard to those two motions, the difference is in the timing of the assistance. I understand it. I do not discern. But it's the same assistance that we're looking at. It is. I think they're birds of the same feather. I think the substantial assistance concept is the same for them both. So if you – if we would take your position that there's no – it's hard to articulate the prejudice, then we would have to affirm that under the plain error standard, correct? That aspect of it, Your Honor. Okay. What Mr. Glasgow has also asserted, Your Honor, is that it was an abuse of the district court's discretion to, at the time of that hearing, to not factor into consideration the substantial assistance that he and everyone agreed that he provided. And in that sense, Mr. Glasgow has asserted there's a violation of law and there was a misapplication of Rule 35B. Now, in saying so, we're not – So now you're addressing the Rule 35 motion. Yes. So having told you that he factored in the substantial assistance as a reluctant customer, you're now saying he abused his discretion to not consider it in addition or more? Yes, Your Honor. Okay. It is clear that he – that after considering it at sentencing, as a sentencing factor, when it came time to consider it, which is – and it's, of course, at the Rule 35 hearing. That is the essence of a Rule 35 hearing. He refused to consider it further. And I am not saying by making this argument that he has to consider that in isolation from any other factors. But we believe it was error for him to refuse to consider it at all. Now, if, in fact, he found that there was considerable cooperation and that was all, does he have to grant a downward departure? Your Honor, the wording of Rule 35 says is that if substantial assistance is rendered, the court may. And so that obviously speaks to the discretion of the court. And the government's point is that the court's discretionary authority to depart downward should not be made somehow mandatory just because it finds qualifying cooperation. But my point in response to that is this. When does that discretion become abused when the defendant has rendered substantial assistance, the court has acknowledged it prior, the United States attorneys have acknowledged it, and the court's refusal to grant it is based on other factors and does not even take into consideration the essence of Rule 35. That is the quality of his substantial assistance. But his subsequent substantial assistance, correct? Well, the court was. I'm just reading the rule, I guess. You're right. You're right. I'm a little stuck on that. Sorry. Well, this should have been a 5K1 hearing. It should have been a 5K1 hearing. I thought that argument was the first one because I kind of got stuck on Rule 35. They put that word subsequent in there. That's right, because it's supposed to refer to cooperation after sentencing. And that just wasn't the case here. Yeah, yeah. Okay. Well, is your position essentially that the judge shouldn't have accepted the plea agreement if he was not going to give a downward for considerable assistance? No, Your Honor, and, of course, I'm not challenging the sentence. The court made a decision to give Mr. Glasgow the sentence it did. But irrespective of that decision, my point is that when a Rule 35 motion is brought before the court, and I realize the rule doesn't speak to what exactly a court has to consider, but it seems to me it's an abuse of his discretion then to go about ignoring the essence of why the parties are there. That's what I'm saying. He says in effect he acknowledged that the defendant had done everything he was supposed to do. He did. And it seemed to me, Your Honor, that what he then decided was, well, you know, that cooperation has been consumed at sentencing. That's been used up. So I don't have to consider that anymore. That's how it struck me, Your Honor, and to me that was abuse of his discretion. And that's Mr. Glasgow's point in that regard. If there are no further questions, I will. Thank you. Thank you. Good morning. My name is Bernie Hubley. I am an assistant U.S. attorney in Helena, Montana, and I handled the prosecution from Mr. Glasgow from the charging through the sentencing. I think the point that we need to reckon with here is was there a downward departure motion agreed to and was one filed? We obviously have a mistake with regard to nomenclature, 5K versus Rule 35. But the motion was filed. The motion is based on substantial assistance, and now with the lessons of the case that was decided, which said 5K pertains to the assistance up to the time of sentencing and Rule 35 for assistance after, we now know what the nomenclature should be in that motion. The reality of the matter here is that a motion for downward departure was filed. It was filed at what stage? It was filed right at the time. It was filed prior to sentencing. It was filed for the purpose of bringing the defendant's substantial assistance to the court's attention at sentencing. The problem with the motion, it was labeled as a Rule 35 motion, but it was basically referencing a 5K substantial assistance. So what we have, again, is a downward departure motion that was agreed to and one that was filed. So are you basically saying that because we didn't have quatch, or you all didn't have quatch at the time, it was kind of one and the same, so it kind of becomes a distinction without a difference as to that period of time? That's exactly right. That's exactly right. What was bargained for was a motion based on substantial assistance. What was delivered was a motion for substantial assistance. We do exactly have a distinction without a difference. Now, the issue then becomes, I think, twofold. Number one, because there was no objection, are you going to look at it in terms of plain air? If you are, where's the prejudice? There is none. Even the defendant's counsel concedes that. The second issue then we move to is, if there is substantial assistance, does either 5K or Rule 35 mandate a downward departure? And I think the law and the plain language of both indicate that the departure is discretionary. It's up to the judge to determine whether or not that should affect the sentence, whether or not the judge should reduce the sentence. In this case, there's no question that the judge realized what he could do. He could go down. He simply said, you've got enough of a break here. I don't think that I should reduce the sentence based on this substantial assistance. That's my discretion. I'm exercising it in that fashion. If you buy into the defendant's argument, you turn the discretionary language of may on its head, and you say must. May does not mean must, and therefore, I think we have to be very careful to make sure we recognize that, that the judge has discretionary authority under either standard, under either provision, and we've got to be careful not to write into that statute that if the judge finds there's substantial assistance, then he must downward depart. The statute says if you find substantial assistance, judge, that's the first step. You have to have that. But once you have that, then you, the judge, can decide what the appropriate sentence should be and whether or not there's a reward and a downward departure for that sentence. As a practical matter, it seems to me that that might show cooperation by defendants. I don't think so, Judge, for this reason. This is somewhat of an unusual case because of the bargain that was made up front gave such a significant break. It's unusual in that respect, and a defendant certainly understands, at least I think they understand based on our plea agreements, that we'll make the motion, but it's up to the judge. And in a case like this, wherein the defendant was given the opportunity to plead to misprison of a felony as opposed to the substantive offense, that you run that risk. Are you going to get a second break in addition to the charge, or is the judge going to use his discretion and say, I think it's enough? I don't care what the government thinks, whether he should get more of a break. I think he's had enough, and I'm not going to downward depart from the sentence. I'm going to accept the plea agreement. I think that that's enough in this particular case. And, of course, that's the role of the judge is to decide the sentence and to exercise his discretion in whether or not he should go down. The government finds itself in a unique position here. We felt that he should be rewarded. We made that motion. We told the judge, here's what he did for us. The judge says, fine, I accept that, and I understand that I can give him a break. I'm not going to do it. Discretion is what we're talking about here. Statutory, the impetus of the statute based on its language is what we're talking about here. We're talking about a discretionary decision on the part of the judge, and I'm concerned that I certainly don't want to see this court or any other court turn the word may into must when it considers substantial assistance. I was interested in one of the practicalities, too, that if under our rule now that 5K1 has to evaluate at that stage, the assistance has been given up to sentencing, and that's denied, and the sentence is given, is there going to be a tendency to not cooperate at trial? No, I think to the contrary. The defendant would probably want to cooperate at trial to get a second chance at sentence. I don't think it would have a chilling effect. The problem that comes in these 5Ks and Rule 35s, look at it for a moment from the prosecutor's standpoint. When we're dealing with defense counsel and defense counsel is dealing with us, we don't know what kind of relief we're eventually going to be asking for. We've got guidance now from Quash, obviously, but we want post-sentence cooperation if we need it. For example, let's suppose we have this situation, and let's suppose Mr. Glasgow had come to sentence prior to the trial of Mr. Duvall, and let's suppose all his cooperation had come in terms of disclosure of information prior to the trial, and then let's suppose he testifies. If he testifies before he's sentenced, according to Quash, it all gets wrapped in 5K. If he gets sentenced, then you take and you kind of split the baby, so to speak, and you give him cooperation under 5K for information he's given up to the time of his sentence. Then, if he testifies against Mr. Duvall after sentence, then the only remedy for relief, downward departure, is Rule 35. We can't predict how that's going to fall, necessarily, when we're negotiating our agreements, so we get into this 5K or Rule 35. Since Quash, we will now say 5K if sentence occurs before any testimony, and Rule 35 if testimony is given after sentence. We'll be more precise if that's the agreement we want to make, but that's how we have to act now. But pre-Quash, we were talking about Rule 35, 5K, sentence, whatever. In this case, he got what he bargained for, but we'll always be faced with the situation if a person gives substantial assistance and the judge doesn't think it's appropriate to depart downward, what is the law? Of course, that's our position. Even after telling the judge, we think this guy gave substantial assistance. Here it is. Judge, it's up to you. We still have to recognize what the law says. The law says the judge has discretion. The law does not say, just because the government found and made the motion for substantial assistance, you now must depart downward, and that's what your decision will revolve around here. And I think that if you write a must into this, you change the statutory law and the guideline provision. Thank you. Thank you. Mr. Warner, did you have any rebuttals? Your Honor, I don't think Mr. Glasgow is trying to make the may into a must, but he is trying to point out that if the court is not even going to consider the essential fact and delve into it and weigh it and calculate it, then that is an abuse of the court's discretion. As far as a chilling effect, this entire appeal, as you can imagine, is brought from the standpoint of a criminal defendant who felt that he did what was necessary and who was told that he did what was necessary to help the prosecution convict the co-defendant and to gain reduction relief. So will there be an effect from this type of a decision? Logic has to say, of course there will. Thank you. Let's hear now in the second case, the Duval case. Good morning. My name is Penelope Strong. I represent the defendant John Arthur Duval. Mr. Duval has asserted the violation of two basic constitutional rights in his submissions before this court. The first concerns his rights under the Fourth Amendment and not only the initial traffic stop whereby he was apprehended, but thereby a series of warrants and searches of his home, his storage unit, his person, together with other ensuing searches. Starting with the traffic stop, it is our contention that there is a critical statute under Montana law that applies here that the trial court abused its discretion and that the officer ignored in making the stop. There are some pertinent facts. Those pertain to the fact that this was a vehicle that was temporarily licensed with what we call a sticker. And once the officer stopped the vehicle that Mr. Duval was driving and approached it, he could readily determine that the vehicle was properly licensed, if you will, because all he had to determine was that the sticker was identifiable and it had not expired. And it is our argument, it was our argument before the trial court, that any ensuing search or further encounters were illegal and a violation of the Fourth Amendment. As you know, there has to be an articulable suspicion to go further, and we also have a statute in Montana that is particular to Montana that says that when an officer makes a so-called Terry stop, if you will, the statute does not use that language, but that's in essence what we're talking about, the seminal case of Terry v. Ohio, that they can go no further once they determine that nothing strange is afoot. So in some... He looked at the front license plate and that didn't really belong to the vehicle. Is that right? Well, there's some talk about the fact that the vehicle was indeed licensed to our client's girlfriend slash common-law wife, Cindy Converse, but he didn't determine that right away, is our contention. Let's take it and say that he's... The car drives by, he looks and he says, well, it's a little odd to me, I mean, one license plate's missing, one is odd, it's a crumpled up thing, so at that point is it okay to stop the car so he can take a look at the... Right, it's okay to make a momentary, very limited stop. Now he stops the car and then he goes up and he says... Now he looks around and he sees that the sticker, which is crumpled up, which is a little unusual, has the name of a lady on it. Can he not inquire to the driver of the car at this point? Well, I would say that perhaps he can, perhaps he can't. I think it's very typical that officers stop vehicles and spouses, girlfriends, friends, whatever, are driving someone else's vehicle. That's true, but I guess if he's looking at it overall, the reason he's kind of got his antenna up, just this kind of combination of these things, and now he's added one more fact, so maybe yes, maybe no, you say, well, say he can chat with the driver, and then once he does that and comes up with this identification problem, doesn't he have enough to go further at that point? He clearly has enough to go further. I would readily concede that. I'm trying to get the linchpin up. Is the problem then when he sees Converse and the lady's name that he then goes and talks to the gentleman, or does the problem come downstream? Well, the point I'm trying to make is that it's the initial problem, and in his warrant application, he didn't say anything about stopping the vehicle because of the lady's name or any of those type of problems. In fact, it's our contention that he misrepresented the circumstances of the stop, and this, of course, pertains to the other Fourth Amendment issues, because he said that the sticker was unidentifiable, which gave the reviewing judge the very mistaken impression that it was just obliterated, and therefore he had to talk to the individual who was driving. I'm just trying to understand how it actually worked, because after he saw the sticker, then he knew it was at least ostensibly a real sticker or a real temporary piece of paper, but didn't he have to stop in order to be able to see that? Or are you suggesting that's something that he should have been able to ascertain without actually stopping the vehicle? I'm contending that when he went up and saw that the sticker was within the relevant time period and he could read it and identify it, that the inquiry should have ended there. So really the problem is that he went up and talked to him after he saw that it was a lady's name. That really is the point at which we would have to say there's no articulable anything at that point. Correct. Am I correct that the license plate on the front did not belong to this car? I believe that you are, Your Honor, but I don't recall that particular fact. I know that it was registered to a Ford Escort because Cindy Converse was trying to transfer those plates, which is allowable when you do the proper paperwork, to the vehicle, this cheap vehicle that she had purchased. At that stage, would the officer have known that it didn't belong to that car? That was exactly the point, Your Honor, that I was going to make. He didn't know that, I don't believe, until he went back and ran his check and made a further inquiry. He sees a car without a rear plate. He sees the crumpled thing and he reads it and it looks like it's probably okay because of the dates and the time. He then walks around the car, sees the front plate, and can't he then go and check and see, does this belong to this car? I think not. I think everything's okay and he should have left. Of course, he could be driving down the street and check the car. There's no running the license plate through the system. It's an intrusion of anything at that point. Isn't that good? Non-intrusive police work. Well, that's why I think we have that extra little statute in Montana that says once they determine everything's okay, the inquiry must end. I've cited to it in my brief, I can't give you the number here, but I say that's the difference. Next issue that I would like to address is the first warrant, and that is the warrant that was used to search my client's home. It is our contention that that warrant is without probable cause when you look under the totality of the circumstances in this case. There are several factors that relate, of course, to this. And in my brief, I've outlined the seven factual bases that this court used to sustain that warrant. And I believe that the court abused its discretion and did not properly assess the facts in comparing it to the totality of the circumstances. And one of the critical facts that they looked at, first of all, is the situation where they did find methamphetamine on my client. It's our argument that the amounts of methamphetamine, the way it was packaged, is consistent with personal use. I believe there were five baggies. Only one contained, I think, a weighable amount. The rest simply had residue. That doesn't say that this individual, who then, of course, can be lawfully arrested and held for the possession of the methamphetamine, is necessarily making that drug at his home. What the officers did next is they called up Ms. Converse, who the jeep belonged to, and asked to secure a consent to search. She said, yeah, I'll sign a consent to search. And they took the further, I think, unacceptable step of going out to the home that she shared with John Duvall. I thought she was going to come down to the place. Well, exactly. She was going to come down, but hello. It was 2 a.m. in the morning. It was cold out. It was winter. Okay, well, I thought that she says I'm going to come down, and if she'd come down and signed the thing, then that would have been the end of the story. But she says she's going to come, and then she doesn't come. So should they have just sat around until it was 8 a.m.? Yes, I think they could have sat around until it was 8 a.m. or maybe even 6 or 7 a.m. Because they had the jeep secured. Well, now she's up. They just talked to her. They had the jeep secured. They had Mr. Duvall in custody, so there's no spoilation of evidence or anything else going on. But she said she would come down. She did, but I think she had a sick pet. And, you know, it's the middle of the night in rural Montana. It's not like she's two blocks away where she can happen on down. Did she say when she was going to come down? I don't recall that particular fact, but I do recall that she promised to connect with them. So it could have been 6 or 8 since your contention? It could have. The point is that they didn't wait too very long, and then they went on a fishing expedition out to the Duvall and Congress residence. And when they got out there, of course, we get to the issue of plain view. And before we talk about that, because that's a little complicated, I would like to talk about her nervous behavior, or I would say her alleged nervous behavior, that the court cited as one of the seven factual basis. And it's our contention that simply doesn't cut it. I guess there's the government, I believe, has asserted that indeed she was a suspect, although it's my contention she was not a suspect at the time. And I've cited some cases with regard to nervousness in this circuit that I think are highly relevant. But the officers didn't really say that she was nervous. They said they saw her moving back and forth quickly when they approached the residence. Well, there can be some other innocent explanations for that type of conduct. And there was no other nervousness. They're subsumed under that conduct also. While the court made a finding, the Miss Converse specifically asked, hey, is this document I'm signing just for my vehicle, or does it pertain to my home as well? The court drew a negative, if you will, inculpatory inference, and I say that's just a good citizen saying, what am I doing here, when you sign a legal document as important as a consent to search? Moving on to the plain view issue, we have the officers arrive, and there are two of them, and only one has training where he's actually been on the site of methamphetamine labs, if you recall those facts. And I believe as they exit the hall, they see hydrogen peroxide and rubbing alcohol, empty bottles, on top of a trash can. And the court draws from that circumstance, and Deputy Goff, and a smell of an odor associated with the production of methamphetamine. Of course, the inference that supports the further factual findings that this was a legitimate plain view intrusion, supporting, of course, the warrant. I have some comments in that regard. First of all, I think we have a situation where you have some innocent circumstances where you could draw two inferences. Hydrogen peroxide and rubbing alcohol are common household chemicals. They're also used to extract, I believe, ephedrine from cold pills in the manufacture of meth. But they're clearly not red phosphorus, hydriotic acid, or the type of chemicals I think where everyone would agree are solely or pretty much substantially intended to make methamphetamine. But I thought that there was a meth odor. Well, if you look at the record, that's very interesting. First of all, I believe both officers said no, that the chemical odor was not in the house. It was outside. And that, I believe, ties into some of the circumstances on the Franks motion. But what the record actually reveals in that regard, and I looked at the transcript recently when I was preparing for argument, Deputy Gothena, the court said there was the odor of meth production smelled by Deputy Gothena, the individual with the meth lab training. And, by the way, he had training on five lab sites, including this one, which I would submit to you is not a lot of training because there are a lot of different formulas and ingredients for methamphetamine, and they can smell differently. He also, Deputy Gothena, said that it was an odor associated with that of meth production. And his partner, Deputy Tucker, said that Gothena told him it was an odor consistent with the odor of methamphetamine production. And Deputy... You've gone now, in terms of your timing, you're way beyond your time. If you want to conclude now, we'll give you one minute for rebuttal, but your four minutes will be on your time. All right. I will conclude by saying that I think the first warrant, the linchpin of my argument, was insufficient. The judge made some mistakes in that regard. And plain view, it has to be readily apparent. And the bottles and the meth production and whatnot, the smell, were not readily apparent. And, therefore, that probable cause should not be sustained. Thank you. Judge Fletcher, you asked a question. I want to clear the record up immediately before we go any further. And for your reference, at page 7 of the supplemental excerpts of record, I'd like to read to you very briefly what the officer saw to clear up your question with regard to the front license plate. The question, explain to the judge, in your own words, the circumstances which led you to stop the vehicle that the defendant was driving in. Answer, I was traveling down First Avenue, First Street West, in Roundup. I observed a Jeep approach me with expired dash. It was the old-style license plate and an expired tag 2000. Now, this takes place in February of 2001. So he's coming this way, the Jeep's coming against him, and he sees an expired plate. I then turned my vehicle around with my lights activated, followed the vehicle for approximately one block, observed no back plate on the vehicle, but did observe a temporary sticker which I could not read. And Judge McKeown, you noted in your comments that it was crumpled, and that is an undisputed fact. Question, okay, why did you stop the vehicle with a front license plate and the sticker? Answer, well, the vehicle shouldn't have had both. It could have either one or the other on it, and I also observed that the front plate was expired, so that was my reason for the stop. Now, let me very briefly go to a couple provisions in Montana law which would prove that the officer was justified in making this stop. First of all, it says that when he said it can't have both, 61-334 of the Montana Code Annotated says, In other words, when you put that temporary sticker on, you take the old plates off. You can't have both. That's a sign something's wrong. This officer is out there at 10 o'clock at night. He sees a car coming at him with an expired plate. He turns around, and it's also got a temporary sticker on it. That's inconsistent with Montana law. Something is wrong. He's entitled to stop that car and ask a question or two, and that's exactly what he did, so I want to make sure that that point is clarified, that there was an expired plate. Judge McKeown, you asked then, what did he do? Defense counsel would like you to believe that when he walked up, he saw the sticker, and he saw that the date was consistent with the time frame. In other words, the expiration date on the temporary sticker was somewhere in March, and this was February. So that, in defense counsel's mind, and what they want to persuade you to believe, is that based on that observation, everything is all right, and he should have simply turned around and went back and got in his patrol car. Well, everything wasn't all right. Just observing the time frame of the date doesn't mean that the temporary sticker was valid. There's something that should have tipped the officer off that maybe something was wrong. The sticker's in the name of Cindy Converse. Cindy is obviously a female name. The driver's a male. It's logical place work. Okay, we have an expired plate. Let's run it. Let's call dispatcher and find out about it to see if they match the temporary sticker. Well, what happens instantaneously there is he receives notification at the scene that, well, the plate's registered to Cindy Converse, but not for that car. Again, he is not in compliance with having a valid plate for the car he's driving. So what's an officer to do? Sir, could I see your driver's license, your registration information, your proof of insurance? By law in Montana, an operator of a vehicle must carry a driver's license 616302. It is unlawful to operate a vehicle without a valid motor vehicle liability insurance policy. That's 302. 301 says you have to have a driver's license, and you must produce it upon demand. Our position would be once you legitimately stop that vehicle for an expired plate, for a dual display of plates which is inconsistent with Montana law, that the officer then certainly has the ability to ask related questions. Who are you? Let me see the ownership documents for this vehicle. Let me see your driver's license so I can sort this out. There's something wrong here. This plate in the front belongs to a different car. This temporary sticker is here. If the temporary sticker is here, this plate should not be here. Who are you, and what is your relationship to this car? And that's what the officer did in asking those questions, and what he came up with is I don't have a driver's license, arrestable offense, probable cause, go to jail, search incident to arrest, find the methamphetamine. He went further and asked who are you, and very obviously determined that he was getting answers which were not adding up. I don't have a driver's license. My date of birth is this. No, it's this. Two different dates of birth. Can I look in your wallet? Oh, sure. He gives the wallet. He sees the name John Duvall. Are you John Duvall? No. Dispatcher, would you run John Duvall's name? What do they get? A hit for failure to appear for a drug manufacturing charge. That is the sequence that happens out on the street. That's sound police work. There's an objective basis to make that stop. The questions are reasonably related to the stop and the questions about registration. That's sound police work. Before I move on, are there any questions with regard to the stop? So I'm understanding the time sequence. So actually, Gosserk had received back from his check on the plates before he questioned further the driver? I can't say that precisely. I would say that literally simultaneous as part of in connection with his inquiry as to why is this plate here, why is this sticker there? I can't tell you exactly which was in sequence. It was all part of the process. I believe the true state of facts are he sees the expired plate, he radios it in, he makes the stop. Somewhere in looking at that vehicle and asking the person who he was in preparation to resolve the discrepancy, he gets notification that the plate doesn't match that car. The exact sequence, sir, I'm sorry, I don't know. I'm not sure that we could even reconstruct it, but it's all part of the process. And I think what we have to focus on with regard to that is the legal significance of it. Did he have the right when he saw the expired plate to run it and wait until he got an answer? I think the answer logically and legally is yes. With regard to the probable cause issue, what's happened? The law on the matter is you look at the totality of the circumstances. What the defendant through his counsel has argued is, yes, that's the law, but let's look at every isolated fact and take it out of the totality picture and look at it individually and say it doesn't establish probable cause. Recognize, too, please, that the judge listed in his findings establishing probable cause certain things, which, I'm satisfied, amounts to probable cause. He didn't even consider the fact that the record check that came back, which was in the affidavit, showed that this person was wanted and had failed to appear for a drug manufacturing charge. That's further evidence which goes beyond the judge's finding, and you can look at that, because in review you simply look to see if the issuing judge had a substantial basis for a finding of probable cause. Counsel didn't even mention the gun. That's a tool of the trade of a drug dealer. Counsel said that the little baggies with a little bit of residue suggest personal use. Multiple baggies with residue suggests a dealer. Multiple baggies of multiple methamphetamine with a bottle which had residue of methamphetamine in the trunk, which could mean he's putting increments in those baggies to sell. That suggests he's a dealer, and a gun is the implement of a drug dealer, and in the Angulo Lopez case decided by this circuit, a drug dealer's house is a logical place to look for the drugs he's dealing. I submit to you that a person who comes back out on a traffic scene as one who has walked away from a controlled substance manufacturing violation, that further bolsters probable cause, and not only will drugs be found in that house, but evidence of manufacture will be found in that house, coupled with the fact that you had methamphetamine odor at that house. One final point, I see my lights on. There is no legal proposition which says that an officer cannot go and knock on a door at 1 o'clock in the morning to investigate a crime. And I would ask you not to establish that legal principle by giving any merit to the argument that the officers did something wrong when they went out to talk to Cindy Converse after she said she would come in and never show, knowing, as Judge McCoon says, that she was up. There should be no Fourth Amendment restriction which would prohibit an officer. How do we know she was up because she answered the phone? Well, sometimes you get up to answer the phone, but you're not really up. Right, but the point is she was alerted and knew that law enforcement were making inquiry. I thought she said, I'm going to come down, then they call her back, and then she said she's sick, so they talked to her twice. No, I don't think they called her back. Did they not call her back? I don't think so. Did she call them back? She just didn't show. Just didn't show. She might have called them back. And she did when she was going to come down. She did not. What we're talking about is the sickness here is I think that you've been misled just a little bit. When she gets out there and she's dilly-dallying about this doesn't apply to my house, she keeps trying to change the conversation that her dog had been hit by a car. So to my knowledge, there's only one call. She says, I'll be down. She doesn't show, so they go out. Should she wait until 8 in the morning? That's a prescription to allow her to destroy evidence all night long. I think that we should not entertain that as a principle that we should advocate. She was up. She said she'd come down. She didn't. They have the right to go out and knock on the door. Is that the key? The fact that she said she was going to come down and didn't? Is that the big factor or is it the fact that they go out there anyway? Why can't a law enforcement officer go out and knock on someone's door at any time? What in the Fourth Amendment prohibits that? I submit to you there's nothing. And in this circumstance, it's even stronger because they knew she was there and she didn't show. Thank you. Mr. O, you can take one minute of rebuttal time. And I will be brief. I would like to point out one inconsistency in the judge's findings as to plain view. If you look at the order, he says he used the methamphetamine found on Mr. Duvall with the order of meth production. I think that's not proper. You need to look at the evidence at the scene of plain view. I have one further point on my Frank's motion, and that is there is a serious problem with the transcript and the tape and I think witness bolstering that went on with Mr. Glasgow. The government says in its brief that the tape was completely or largely inaudible, but the testimony of Deputy Goffin points out that his voice, the county attorney's voice came out, but Mr. Glasgow's voice did not come out for some reason. I submit to you that's because Mr. Glasgow was not credible, not because there was a technical problem with the tape. Lastly, I want to go to the second issue, the cross-examination issue. The analogy I would make here, Judge Siebel, the lower court, would not allow full range of cross-examination. This converse faced a total of 123 years. Your Honor, not to be too flip, but it's like if you go and get something on a big discount at a sale and you go to tell your friends about how much it originally cost. The entire point of that was not able to be made with the jury. This court has said that if relevant cross-examination is prohibited and prejudice is shown, that you need to look at a serious remedy, and Mr. Duvall deserves that remedy here. Thank you. Thank you. Thank you to all counsel. Thank you for waiting to the end of the calendar. The cases of United States v. Glasgow and Duvall are submitted and we're adjourned for today.
judges: Hug, B Fletcher, McKeown